IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MANAGEDSTORAGE INTERNATIONAL, INC., | ) Case No. 09-10368 (   ) |
| et al.,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |

**MOTION OF DEBTORS FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 503(b), 1107 AND 1108 AUTHORIZING (I) MAINTENANCE OF EXISTING BANK ACCOUNTS, (II) CONTINUED USE OF EXISTING BUSINESS FORMS, (III) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (IV) PROVIDING ADMINISTRATIVE PRIORITY STATUS TO POSTPETITION INTERCOMPANY CLAIMS AND (V) THE WAIVER OF SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move the Court for entry of an order under 11 U.S.C. §§ 105, 363, 503(b), 1107 and 1108, authorizing (i) the maintenance of existing bank accounts, including the authority to pay routine prepetition banking fees owed to financial institutions, (ii) the continued use of existing business forms, (iii) the continued use of the existing cash management system for the Debtors, (iv) the provision of administrative priority to postpetition intercompany claims, and (v) the waiver of 11 U.S.C. § 345(b) deposit and investment guidelines (the "Motion"). In support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, and their respective addresses, are: ManagedStorage International, Inc. (6252,) 12303 Airport Way, Suite 250, Broomfield, CO 80201; Incentra Solutions, Inc. (3960), 1140 Pearl Street, Boulder, CO 80302; Incentra Solutions of California, Inc. (3782), 4122 Sorrento Valley Blvd., Suite 102, San Diego, CA 92121; Network System Technologies, Inc. (8009), 2050-80 Finley Drive, Lombard, IL 60148; Incentra Solutions of the Northeast, Inc. (8372), 1140 Pearl Street, Boulder, CO 80302; Incentra Solutions of the Northwest, Inc. (8930), 9020 SW Washington Square Road, Suite 500, Portland, OR 97223; Sales Strategies, Inc. (0515), 6 Bridge Street, Unit 5, Metuchen, NJ 08840; and Incentra Solutions International, Inc. (1239), 15 Old Bailey, London EC4M 7EF, United Kingdom.

## Jurisdiction

1.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) (A), (M), and (O). Venue of these proceedings and the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105(a), 345(b), 363, 503(b), 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

## Background

3.     On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     No trustee, examiner or committee has been appointed in any of the Debtors' chapter 11 cases.

6.     The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of Anthony DiPaolo in Support of Chapter 11 Petition and First Day Motions* (the "DiPaolo Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

**Relief Requested**

7.      By this Motion, the Debtors seek authorization (1) to maintain their existing bank accounts and to pay any prepetition routine banking fees imposed by the Debtors' financial institutions where the bank accounts are maintained, (2) to continue to use their existing business forms, (3) to continue to use their existing cash management system, (4) to provide administrative priority to postpetition intercompany claims, and (5) of a waiver of the deposit and investment guidelines imposed under section 345(b) of the Bankruptcy Code.  Accordingly, the Debtors respectfully request the entry of an order pursuant to sections 105, 345, 363, 503(b), 1107 and 1108 of the Bankruptcy Code granting such authority.

**The Cash Management System**

A.      **In General**

8.      The Debtors' cash management system (the "Cash Management System") is an integrated network of bank accounts that facilitates the timely and efficient collection, management and disbursement of funds used in or in connection with the Debtors' businesses.  Because of the nature of the Debtors' operations and the disruption to the business that would result if they were forced to close these accounts, it is critical that the existing Cash Management System remain in place.

9.      The Cash Management System consists of approximately 23 bank accounts (collectively, the "Bank Accounts"), with 13 accounts (as well as six lockboxes) maintained at Wells Fargo Bank, N.A. ("Wells Fargo") and the balance of the accounts

maintained at Comerica Bank ("Comerica"), Key Bank, PNC Bank ("PNC"), and Lloyds TSB (together with its affiliates, "Lloyds").[2]  A diagram showing the general flow of funds among the accounts in the Cash Management System is attached hereto as Exhibit A.  A description of each account appears in Exhibit B, attached hereto.

**B.    Lockboxes and Deposit Accounts**

10.    The Debtors' business collections and other receipts in the form of checks and/or wire transfers (as applicable) are transferred into one or more of the following:

(i.)    Most customer payments are received at one of six lockboxes maintained at Wells Fargo Bank ("Lockbox(es)").  There is a specific Lockbox for each of the Debtors' six broadly divided business units (i.e., Colorado, Northwest, Midwest, Eastern and two Western units).  To maximize efficiency and as required by their prepetition lenders, the Debtors have been transitioning most customer payments to the Lockboxes, instead of the Comerica Account, the PNC Accounts, and the Miscellaneous Deposit Accounts (defined and described below).  As discussed below, all funds received at the Lockboxes are automatically swept into the Sweep Account (defined below).

(ii.)    On occasional basis, customer payments and other receipts (in the form of ACH payments, checks and/or wires) are sent to several, earlier established accounts maintained at Comerica Bank and PNC Bank (respectively, the "Comerica Account" and the

---

[2] Prior to the Petition Date, the Debtors were in the process of closing an infrequently-used account maintained at The PrivateBank and expect to complete such process shortly.  Further, as discussed herein, there is only occasional activity in certain other accounts, and the Debtors are anticipating that some such accounts may be subsequently closed and receipts/disbursements consolidated in the other already existing Bank Accounts.  Finally, the Debtors note that, as set forth on Exhibit B attached hereto, there is a bank account maintained at Wells Fargo Bank, which is controlled by the Debtors' third party administrator which administers the Flexible Spending Account (FSA) program offered by the Debtors to their employees.  The Debtors do not and cannot make any disbursements out of the FSA account, and the Debtors or their agents remit employees' FSA contributions to this account.

"PNC Accounts"). Generally, the Comerica Account is only used for the operations of Debtor

Incentra Solutions of California, Inc. ("Incentra California"), and the PNC Accounts are only

used in connection with the operations of Debtor Sales Strategies Inc. ("Sales Strategies").

   (iii.) Payments from foreign customers are deposited into certain

accounts maintained at Wells Fargo (the "WF Foreign Accounts") and Lloyds (the "Lloyds

Account" and together with the WF Foreign Accounts, the "Foreign Fund Accounts"). Certain

customer payments and other receipts of the Debtors' U.K. business unit are deposited into the

Lloyds Account, while the balance is deposited into the applicable WF Foreign Account.

Payments and other transfers from all other European customers and parties outside of the United

Kingdom and Japanese customers (in their applicable foreign currency) are made into the WF

Foreign Accounts.

   (iv.) Only occasionally, customer payments and other receipts (in the

form of ACH payments and/or wires) are deposited into certain, earlier established accounts

(collectively, "Miscellaneous Deposit Accounts") maintained at Wells Fargo (all but one of

which accounts are controlled by the Debtors' prepetition senior lenders ("Prior Lender

Controlled Accounts")). In about late 2006, to further centralize the Cash Management System,

the Debtors transitioned away from frequent use of the earlier established Miscellaneous Deposit

Accounts, so that now, as discussed further above, most customer and other receipts are sent to

the Lockboxes which funds are swept daily into a single lender-controlled account – the "Sweep

Account" discussed above. As noted, occasionally, some customers continue to send payments

to the Miscellaneous Deposit Accounts.

(v.) The Debtors' credit card collections are received at an account maintained at Key Bank (the "Key Bank Account") and in the Comerica Account described above. The Debtors closely monitor the amounts held in these Bank Accounts, and prior to the Petition Date, regularly transferred all excess funds therein to the Sweep Account (discussed below). Relatively few customers pay by credit card, and as noted, the deposits in these accounts are regularly reviewed and swept.

## C.    The Sweep Account and Operating/Disbursement Accounts

### 1.    Debtors' Monitoring and Sweeps to the Prepetition Lenders

11. All funds in the Lockboxes are swept daily into an account (account xxxxxxx1442) maintained at Wells Fargo and controlled by the Debtors' prepetition secured lenders (the "Sweep Account"). Each business day, the monies in the Sweep Account are swept to a separate account of the lenders, and the amounts are applied to pay down the Debtors' obligations under the prepetition loan documents.

12. Funds in the Comerica Account and PNC Accounts are closely monitored by the Debtors and regularly swept into the Sweep Account. On a regular basis, depending on business need, the Debtors withdraw all excess funds and leave only enough funds in (i) the Comerica Account in order for Incentra California to issue and honor checks for certain of its business expenditures and (ii) the PNC Accounts in order for Sales Strategies to similarly issue and honor checks for certain business costs. Because it is in the Debtors' economic interest to pay down their loan obligations, the Debtors attempt to keep the balances of the Comerica Account and PNC Accounts as low as possible at all times,

depending on the applicable Debtors' funding needs at the time, and prior to the Petition

Date, these accounts were regularly swept by the Debtors into the Sweep Account.

13.    The Foreign Fund Accounts are handled in substantially similar

fashion. The Lloyds Account is closely monitored by the Debtors and excess funds therein

are regularly transferred to the Sweep Account; typically, the Debtors leave only a sufficient

amount in this account for the Debtors to pay the relatively limited business expenditures of

the U.K. business unit (such as rent payment and cell phone related payments). Thus, the

typical balance maintained in the Lloyds Account ranges from only approximately £5,000 to

£15,000 (approximately $6,800 to $20,000) (although prepetition, infrequently, the balance

in the Lloyds Account was as high as approximately $75,000-$80,000). Subject to business

needs, the Debtors anticipate maintaining a consistently low balance in this account

postpetition. Generally, customer payments and other receipts in foreign currency are

deposited into, and some disbursements in foreign currency are made out, of the WF Foreign

Accounts. Typically the most that is kept in the WF Foreign Accounts is approximately

$200,000 in the aggregate, with the balances substantially lower at other points. These

accounts are closely monitored, and the funds therein are converted into U.S. currency and

regularly swept into the Sweep Account. Subject to business needs and economic factors

(such as the currency exchange rates), the Debtors anticipate maintaining balances as low as

possible in the Wells Fargo Foreign Accounts postpetition, and do not expect to hold for any

lengthy period any more than approximately $100,000 in any of the three Wells Fargo

Foreign Accounts.    In all events, the Debtors will be monitoring the balances and activities

of these accounts each business day.

14.    Receipts in the Key Bank Account are closely monitored, and any and

all funds in these accounts are promptly swept into the Sweep Account once it is determined

that credit card receipts are in this account (as discussed above, this account is used for credit

card receipts and relatively few customers pay by credit card).  All receipts in the

Miscellaneous Deposit Accounts are automatically transferred to either the Debtors'

prepetition lenders in the case of the Prior Lender Controlled Accounts or to the Main

Operating Account (through another zero balance account) in the case of the other

Miscellaneous Deposit Account.

**2.    Funding and Disbursements**

15.    Pursuant to the parties' credit arrangements, the Debtors' lenders

advance funds, on as-needed basis (one to three or more times a week), into a main operating

account maintained at Wells Fargo (account no. xxxxxx6281) (the "Main Operating

Account").  Most disbursements are made out of this account by the Debtors for operating

and other expenses, including payments to most of the Debtors' suppliers and vendors and to

fund employee payroll.  Generally, prior to the Petition Date, as with the other Bank

Accounts, in order to be able to use all excess funds to pay down their credit facility

obligations, the Debtors attempted to maintain a daily closing balance in the Main Operating

Account as low as possible, having the Main Operating Account funded by the lenders with

just enough monies to cover floating checks and pay the Debtors' anticipated short-term

operations and business costs.  However, if anticipated expenditures warrant it, the Debtors might only temporarily have larger amounts in the Main Operating Account.

16.    To meet the funding needs of certain of the Debtor subsidiaries of Incentra Solutions, Inc. (the "Debtor Subsidiaries"), funds are transferred from the Main Operating Account into certain accounts maintained by the Debtor Subsidiaries at Wells Fargo (the "Debtor Subsidiary Accounts").  Funds are transferred immediately as needed into the zero-balance Subsidiary Accounts as checks issued by the Debtor Subsidiaries clear. Finally, only rarely are funds transferred from the Main Operating Account into the Foreign Fund Accounts, depending on foreign business needs.

17.    Generally, all disbursements out of the Bank Accounts must be approved and are processed and controlled by the Debtors' personnel at the Colorado headquarters.

**D.    Miscellaneous Accounts**

18.    In addition to the Comerica Account (for certain receipts/disbursements as described above), the Debtors have a money market account maintained at Comerica, which they established in order to avoid certain fees and charges that would otherwise be charged by Comerica if they only maintained a checking account (the Comerica Account).  The Debtors anticipate closing this account promptly postpetition.

19.    In addition to the PNC Accounts described above, the Debtors also have a money market account maintained at PNC.  Prepetition, the Debtors had established this account in the name of Sales Strategies to earn some interest on that subsidiary's cash

holdings, and frequently (once or more times a week), the Debtors would transfer monies

back and forth between this money market account and other operating PNC Bank Account,

taking into account Sales Strategies' short term funding needs.

### The Court Should Authorize the
### Debtors to Maintain Existing Bank Accounts

20.     The United States Trustee for the District of Delaware has established

certain operating guidelines for debtors in possession.  One such provision requires a chapter

11 debtor in possession to open new bank accounts and close all existing accounts.  The

United States Trustee Guidelines also require that the new bank accounts only be opened in

certain financial institutions designated as authorized depositories by the United States

Trustee.  This requirement, designed to provide a clear line of demarcation between

prepetition and postpetition claims and payments, helps to protect against the inadvertent

payment of prepetition claims by preventing banks from honoring checks drawn before the

Petition Date.

21.     The Debtors seek a waiver of the United States Trustee's requirement

that the Bank Accounts be closed and new postpetition bank accounts be opened at

depositories authorized by the United States Trustee.  If strictly enforced in these cases, the

United States Trustee's requirement would cause a severe disruption in the Debtors'

activities and would impair the Debtors' ability to operate under chapter 11.

22.     Maintenance of the Bank Accounts will greatly facilitate the Debtors'

operations in chapter 11.  As noted on Exhibit A hereto, all payments from the Debtors'

customers and other receipts are deposited into the Lockboxes or certain Bank Accounts,

including payments made by check, credit card, or wire transfer. Funds received in the Lockboxes are swept daily, and the other accounts are closely monitored each business day and any excess funds are regularly (at least weekly) swept by the Debtors into the Sweep Account. In most cases, the Debtors' customers have long been sending payments in the form of checks to the Lockboxes or in the form of checks or wires to other designated Bank Accounts. Any necessary funding for operations is made by the Debtors directly out of the Main Operating Account or out of Debtor Subsidiary Accounts (funded from the Main Operating Account). If the Bank Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative payment procedures with many of their customers, which would completely disrupt the flow of the Debtors' receipt of sales revenues and potentially, in turn, the Debtors' timely payment of postpetition debts and obligations. Any delays in payment by the Debtors of accounts payable and other obligations caused by having to set up new disbursement and other accounts and related payment arrangements would likewise harm the Debtors' normal business operations. With particular regard to the Foreign Fund Accounts, the Debtors need such accounts to remain operational given their foreign customer receipts and disbursements. Moreover, because of the stringent requirements of many banks in foreign jurisdictions, the Debtors believe that it would likely take a substantial amount of time to open new accounts in the foreign jurisdictions; it took the Debtors approximately two-three months to go through the process of opening the Lloyds Account. The foregoing disruptions as to both receipts and disbursements and the likely substantial delays and problems that could be encountered with foreign banks would severely

impact and irreparably harm the Debtors' ability to operate their businesses. To avoid disruptions and delays in the operation of the Debtors' business, the Debtors should be permitted to continue to maintain their existing Bank Accounts and, if necessary, to open new accounts or close unnecessary existing accounts.

23.    To guard against improper transfers resulting from the postpetition honoring of prepetition checks, banks may not honor checks drawn on the Debtors' accounts before the Petition Date, except upon limited Court-approved exceptions. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

24.    If the relief requested herein is granted, the Debtors will not pay, and each of their banks where the Bank Accounts are maintained will be instructed not to pay, any debts incurred before the Petition Date other than as specifically authorized by this Court.

### The Court Should Authorize the Debtors to
### Continue Their Existing Cash Management System

25.    The Debtors hereby seek authority to continue to use their Cash Management System, as such system may be modified pursuant to the requirements of any Court-approved debtor in possession financing facility and/or cash collateral usage and related order(s) of this Court.

26.    For the reasons set forth above, the Debtors' Cash Management

System constitutes an essential business practice and was created and implemented by the

management of the Debtors in the exercise of their business judgment.  While some accounts

have been added over time, most elements of the Cash Management System have been in

place for two years.  The common use of such a Cash Management System, moreover, is

attributable to the numerous benefits it provides, including the ability to (a) process and

timely pay expenses; (b) allow a mechanism for deposits to pay down the debtors'

obligations owed to their lenders; (c) ensure cash availability; (d) control and monitor

corporate funds; and (e) reduce administrative expenses by facilitating the movement of

funds and the development of timely and accurate balance and presentment information.  In

addition, preserving a "business as usual" atmosphere and avoiding the unnecessary

distractions that would inevitably be associated with a substantial disruption of the Cash

Management System will facilitate and enhance the Debtors' efforts to continue to operate

postpetition pending the contemplated sale of the Debtors' assets.  Additionally, as discussed

further below, the Debtors submit that the relief requested is consistent with the relief

provided to debtors in a number of other cases pending in this district.

## The Court Should Grant the Debtors
## Authority To Use Existing Business Forms and Checks Until
## They Can Make the Necessary Changes

27.    To minimize expense to their estates, the Debtors request authority to

continue to use on an interim basis all correspondence and business forms (including, but not

limited to letterhead, purchase orders, invoices, etc.), as well as any preprinted checks, without reference to their "debtor in possession" status.

28.     In order to change their existing business forms and checks, the Debtors must redesign their corporate logo that displays the Debtors' name, to add "Debtor in Possession" label on their business forms (the "Business Forms"). Once a new form is designed, the Debtors' personnel would then need to implement the modifications on the Debtors' computer applications as to various Business Forms. Also, while most Business Forms are created internally by the Debtors, the Debtors believe that there may be a smaller amount of Business Forms at some of the Debtors' locations, which documents were preprinted by outside vendors; the Debtors would have to coordinate with the outside suppliers on the appropriate modifications for such forms.

29.     The Debtors do not believe that the modification of most Business Forms will take very long; the Debtors hope to appropriately modify all of the various electronically manipulated Business Forms within a week of the Petition Date. Especially given that the Debtors' personnel will be focused on postpetition operations and other pressing matters in the bankruptcy cases, the Debtors request a limited waiver of the requirements (i) as to internally generated Business Forms, until they are able to effectuate the necessary design and technology changes, and (ii) as to any preprinted Business Forms, until the Debtors' existing supply is exhausted.

30.     Parties doing business with the Debtors undoubtedly will be aware, as a result of the notice that will be sent of the filing of the cases and the publicity of the filing,

of each of the Debtor's status as a chapter 11 debtor in possession. Being required to immediately change all correspondence and business forms would be unnecessary and burdensome to the estates, as well as disruptive to the Debtors' efforts and needs during this critical early stage of the bankruptcy cases.

31.     For these reasons, the Debtors request that they be authorized to use their existing Business Forms until such time as they are reasonably able to effectuate the necessary changes required to add the words "Debtor in Possession" to such forms, provided that in the case any of the Debtors' preprinted forms, the Debtors should be authorized to continue to use their existing supplies until depleted.

### Payment of Outstanding Routine Prepetition Expenses
### Relating to the Operation of the Cash Management System

32.     In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System. The Debtors seek authority, in their sole discretion, to pay any such routine prepetition banking fees.

### Claims Arising From Postpetition Intercompany Transfers
### Should be Afforded Administrative Expense Status

33.     As described above, under the Cash Management System, substantially all of the funds generated by the business operations of each participating Debtor flows into various Bank Accounts, which are swept into the Sweep Account.

34.     Prior to the Petition Date, the Debtors, amongst themselves, engaged in intercompany financial transactions in the ordinary course of their businesses (collectively, the "Intercompany Transactions"). These Intercompany Transactions are recorded on the

applicable Debtor's books and records as an intercompany payable or receivable, as applicable. All of these Intercompany Transactions are made between and among certain Debtors in the ordinary course of the Debtors' business as part of their consolidated Cash Management System.

35.    At any given time, there may be intercompany balances among the Debtors. These balances represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System. The Debtors maintain records of these transfers of cash and can ascertain, trace and account for these Intercompany Transactions. The Debtors, moreover, will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

36.    To ensure each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims against a Debtor by another Debtor arising after the Petition Date as a result of ordinary course intercompany transactions through the Cash Management System (collectively, "Intercompany Claims"), be accorded administrative priority expense status. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

## The Court Should Grant a § 345(b) Waiver

37.     The Debtors seek a waiver of section 345(b) of the Bankruptcy Code.

The waiver would permit the Debtors to maintain their Bank Accounts without posting a

bond or other security, as would otherwise be required under section 345(b).  As explained

above, under the Cash Management System, regularly (daily in some cases and at least

weekly in other cases), all excess funds in the Bank Accounts are swept into the Sweep

Account, and the Debtors fund disbursement accounts only on an as-needed basis, keeping

the balances thereof as low as possible (zero in most cases).  In this case, therefore, because

none of the Bank Accounts will hold a substantial amount for any lengthy period, the risk of

loss, which section 345 protects against, is minimal.  Finally, all of the U.S. Bank Accounts

are maintained at financial institutions (the "Banks") that are federally insured institutions.

After the Petition Date, the Debtors will present to the U.S. Banks for execution the form of

collateralization agreement approved by the UST with respect to collateralizing the Bank

Accounts.

38.     With regard to the Foreign Accounts, these Bank Accounts may not be

similarly insured by the applicable governments, but, as discussed above, each of these

accounts are closely monitored each business day and all funds in the WF Foreign Accounts

and excess funds in the Lloyds Account (leaving usually a small amount of funds ranging up

to approximately $20,000) are regularly converted into U.S. currency and transferred into the

Sweep Account (depending on the Debtors' business needs).  If necessary, the Debtors can

promptly implement this process within a couple of business days or shorter period in order

to minimize their risk with respect to the Foreign Accounts.  In all events, these accounts,

like all the Bank Accounts, are carefully monitored each business day.

## Authority for the Requested Relief

**A.    The Continued Use of the Debtors' Routine Cash Management
System, Bank Accounts and Business Forms is Essential to the
Debtors' Operations, and Approval to Maintain the Status Quo
is Routinely Granted Under the Bankruptcy Code Sections 363 and 105**

39.    Bankruptcy courts routinely grant chapter 11 debtors authority to

continue utilizing existing cash management systems and treat requests for such authority as

a relatively "simple matter."  *In re Baldwin-United Corp.*, 79 B.R.  321, 327 (Bankr. S.D.

Ohio 1987).  This is particularly true where, as here, the chapter 11 case involves affiliated

entities with complex financial affairs.  In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985),

for example, the bankruptcy court entered an order authorizing the debtor and forty-three

(43) of its subsidiaries "to continue to consolidate the management of its cash as has been

usual and customary in the past, and to transfer monies from affiliated entity to entity,

including operating entities that are not debtors." *Id.* at 620.  The Eleventh Circuit Court of

Appeals then affirmed a subsequent district court decision denying a creditor's motion for

leave to appeal the bankruptcy court's cash management order, holding that authorizing the

debtor to utilize its prepetition "routine cash management system" was "entirely consistent"

with applicable provisions of the Bankruptcy Code. *Id.*  at 621.

40.    Likewise, in another context, the bankruptcy court in the *Columbia

Gas* chapter 11 case explained that a centralized cash management system "allows efficient

utilization of cash resources and recognizes the impracticabilities of maintaining separate

cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1993), *aff'd in part* and *rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 114 S. Ct. 1050 (1994). The Third Circuit agreed, emphasizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061. *See also In re Southmark Corp.*, 49 F.3d 111, 114 (5th Cir. 1995) (cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets"); *In re UNR Indus., Inc.*, 46 B.R. 25, 27 (Bankr. N.D. Ill. 1984).

41. Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without undue oversight by creditors or the court. *Medical Malpractice Ins. Ass'n. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2nd Cir. 1997). Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtors seek authority under section 363(c)(1) of the Bankruptcy Code to continue the collection, concentration, and disbursement of cash pursuant to their Cash Management System described above.

42.     Additionally the Court may exercise its equitable powers to grant the relief requested herein.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title."  11 U.S.C. § 105(a).  Continuing the Debtor's Cash Management System without interruption is vital to the success of these chapter 11 cases.  The Cash Management System is a complex, integrated mechanism whereby the Debtors are able to transfer their revenues toward the payment of their obligations and without which the Debtors' operations would be severely hindered and harmed.

43.     In other cases in this District, this Court has granted relief similar to that requested in this Motion.  *See, e.g., In re Retail Pro, Inc., et al.*, Case No. 09-10087 (PJW) (Bankr. D. Del. January 13, 2009); *In re Recycled Paper Greetings, Inc., et al.* (Bankr. D. Del. January 5, 2009); *In re Western Nonwovens, Inc.*, Case No. 08-11435 (PJW) (Bankr. D. Del. July 15, 2008); *In re Global Motorsport Group, Inc.*, Case No. 08-10192 (KJC) (Bankr. D. Del. February 1, 2008); *In re Answer Financial Inc.*, Case No. 08-10140 (MFW) (Bankr. D. Del. January 23, 2008); *In re Mortgage Lenders Network, USA, Inc.*, Case No. 07-10146 (Bank. D. Del. February 5, 2007); *In re Global Home Products, LLC et al.*, Case No. 06-10340 (Bankr. D. Del. April 11, 2006).

44.     It is well within the Court's equitable power under section 105(a) to approve the continued use of the Cash Management System, and to authorize the Debtors' continued use of their existing business forms, including, but not limited to, purchase orders, letterhead, envelopes, promotional materials, checks and Business Forms and without

reference to the Debtors' debtor in possession status, substantially in the forms existing

immediately before the Petition Date.

**B.     A Waiver of Section 345(b) to Allow the Debtors to Continue to
        Use Their Bank Accounts Without the Need for Posting a Bond
        or Providing Other Security is Appropriate in These Cases**

45.     Bankruptcy Code § 345(a) authorizes deposits or investments of

money "as will yield the maximum reasonable net return on such money, taking into account

the safety of such deposit or investment." Section 345(b) provides:

> Except with respect to a deposit or investment that is insured or
> guaranteed by the United States or by a department, agency, or
> instrumentality of the United States or backed by the full faith and credit
> of the United States, the trustee shall require from an entity with which
> such money is deposited or invested --
>
> 1)     a bond –
>
>        A.     in favor of the United States;
>
>        B.     secured by the undertaking of a corporate
>               surety approved by the United States trustee
>               for the district in which the case is pending;
>               and
>
>        C.     conditioned on --
>
>               i)      a proper accounting of all money so deposited or
>                       invested and for any return on such money;
>
>               ii)     prompt repayment of such money and return; and
>
>               iii)    faithful performance of duties as a depository; or
>
> 2)     the deposit of securities of the kind specified in section 9303 of
>        title 31 unless the court for cause orders otherwise.

46.    The Court's ability to excuse strict performance of the deposit and

investment requirements of § 345(b) "for cause" arises from the 1994 amendments to the

Bankruptcy Code.  The legislative history of that amendment provides:

> Section 345 of the Code governs investments of funds of
> bankruptcy estates.  The purposes (sic) is to make sure that funds
> of a bankrupt that are obliged to creditors are invested prudently
> and safely with the eventual goal of being able to satisfy all claims
> against the bankruptcy estate.  Under current law, all investments
> are required to be FDIC insured, collateralized or bonded.  While
> this requirement is wise in the case of smaller Debtor with limited
> funds that cannot afford a risky investment to be lost, it can work
> to needlessly handcuff larger, more sophisticated Debtors.  This
> section would amend the Code to allow the courts to approve
> investments other than those permitted by section 345(b) for just
> cause, thereby overruling In re Columbia Gas Systems, Inc., 33
> F.3d 294 (3d Cir. 1994).

*In re Service Merchandise Company, Inc.,* 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting

H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4,

1994)) (emphasis added).

47.    In determining whether the "for cause" standard has been met, the

Court should consider a "totality of the circumstances," utilizing the following factors:

(i.)    The sophistication of the debtor's business;

(ii.)    The size of the debtor's business operations;

(iii.)    The amount of the investments involved;

(iv.)    The bank ratings (Moody's and Standard and Poor) of the financial

institutions where the debtor in possession funds are held;

(v.)    The complexity of the case;

(vi.)    The safeguards in place within the debtor's own business of insuring the safety of the funds;

(vii.)    The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(viii.)    The benefit to the debtor;

(ix.)    The harm, if any, to the estate; and

(x.)    The reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

Id.

48.    Because of the nature of their operating businesses, the Debtors may, at certain times, have funds accumulated in the Main Operating Account and potentially, although unlikely, other Bank Accounts that exceed the limits provided in section 345 (specifically, above the $250,000 FDIC-insurance limit), and therefore necessitate a limited waiver of section 345(b).  Further, as discussed above, the Debtors have several Foreign Fund Accounts which are not FDIC-insured.  Unless the Debtors are granted a limited waiver from Bankruptcy Code section 345(b), the Debtors' businesses and their ability to successfully administer and prosecute these cases will be severely prejudiced for the reasons discussed above.  The Debtors submit that their funds will not be sufficiently at risk to necessitate strict adherence to the requirements of section 345(b) of the Bankruptcy Code.

49.    In other chapter 11 cases, courts have liberally construed the requirement of section 345(b) that a debtor in possession obtain a bond from any entity with

which its money is deposited or invested.  In those instances, courts, including many within this district, have waived the requirements of section 345(b) and replaced them with alternative procedures. *See e.g., In re Retail Pro, Inc., et al.*, Case No. 09-10087 (PJW) (Bankr. D. Del. January 13, 2009); *In re Western Nonwovens, Inc.*, Case No. 08-11435 (PJW) (Bankr. D. Del. July 15, 2008); *In re Global Motorsport Group, Inc.*, Case No. 08-10192 (KJC) (Bankr. D. Del. February 1, 2008); *In re Answer Financial Inc.*, Case No. 08-10140 (MFW) (Bankr. D. Del. January 23, 2008); *In re Aegis Mortgage Corp.,* Case No. 07-11119 (BSL) (Bank. D. Del. August 16, 2007); *In re Mortgage Lenders Network, USA, Inc.*, Case No. 07-10146 (PJW) (Bank. D.Del. February 5, 2007).  *See also In re Breuners Home Furnishings Corp.*, Case No. 04-12030 (PJW) (Bankr. D. Del. July 16, 2004); *In re Redback Networks, Inc.,* Case No. 03-13359 (CGC) (Bankr. D. Del. November 5, 2003); *In re Focal Communications Corporation*, Case No. 02-13709 (KJC) (Bankr. D. Del. December 20, 2002).

50.    In sum, it is critical that the Debtors continue to utilize their existing Cash Management System and continue to use their existing Business Forms as set forth herein, without disruption.  Accordingly, it is appropriate and entirely consistent with applicable provisions of the Bankruptcy Code and case law for the Court to approve the Debtors' centralized Cash Management System in its current form.

## Notice

51.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; and (ii) the

Debtors' prepetition and postpetition lenders.  As the Motion is seeking "first day" relief,

within two business days of the hearing on the Motion, the Debtors will serve copies of the

Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-

1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or

further notice need be given.

### **No Prior Request**

52.    No prior motion for the relief requested herein has been made to this

or any other Court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto (i) authorizing the Debtors to maintain the Bank Accounts, subject to the Debtors' ability, in their discretion, to close any unnecessary Bank Accounts throughout these chapter 11 cases; (ii) authorizing the Debtors to continue to use their existing business forms without reference to the debtor in possession status until the necessary modifications to business forms can be made; (iii) authorizing the Debtors to continue to employ their existing Cash Management System; (iv) providing administrative priority to postpetition Intercompany Claims; (v) granting a limited waiver of the investment and deposit guidelines set forth in Bankruptcy Code Section 345(b); and (vi) granting such other and further relief as the Court deems appropriate.

Dated:  February 4 , 2009

PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No. 143717)
John Fiero (CA Bar No. 136557)
Bruce Grohsgal (Bar No. 3583)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  jpomerantz@pszjlaw.com
         jfiero@pszjlaw.com
         bgrohsgal@pszjlaw.com


[Proposed] Counsel for the Debtors and
Debtors in Possession