## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MANAGED STORAGE | ) | Case No. 09-10368 (MFW) |
| INTERNATIONAL, INC., et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |

### OPINION[1]

Before the Court is a matter remanded from the District Court on the appeal of this Court's decision dated November 26, 2012, dismissing the chapter 7 trustee's complaint to avoid and recover preferential transfers of $5,444,541.11 against Avnet, Inc. ("Avnet"). In the November 26 decision, this Court held that the Trustee was bound by the terms of a stipulation executed by the Debtors which released Avnet from liability on avoidance actions (the "Stipulation"). The District Court directed the Court on remand to assess the Stipulation in accordance with the Third Circuit's opinion in In re Martin, 91 F.3d 389, 393 (3d Cir. 1996). For the reasons discussed below, the Court finds that the application of the Martin factors supports approval of the Stipulation.

---

[1]    This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is incorporated by reference in Rule 9014.

I.   <u>BACKGROUND</u>

Managed Storage International, Inc., and its related affiliates ("the Debtors") filed petitions for relief under chapter 11 on February 4, 2009.  Pre-petition, Avnet had sold products to the Debtors on an unsecured basis.  By the end of October 2008, however, the Debtors had exceeded their $4 million credit limit with Avnet.  As a result, the Debtors and Avnet entered into a purchase money security interest ("PMSI") on October 28, 2008, pursuant to which Avnet fulfilled two purchase orders for the Debtors totaling $542,375.76.  Thereafter, the Debtors' and Avnet's business dealings continued on an unsecured basis until around December 17, 2008, when Avnet again insisted on selling its products to the Debtors on a secured basis pursuant to a PMSI.  As of the petition date, Avnet asserted a secured claim of $1,322,473.60 and an unsecured claim of $298,699.86.

On the Petition Date, the Debtors filed a motion to approve the sale of all their assets (the "Sale Motion") to Laurus Master Fund, Ltd. ("Laurus").  (D.I. 15, 16.)  On March 24, 2009, Avnet filed an objection to the Sale Motion seeking to clarify the treatment of Avnet's PMSI collateral.  As a result, the Debtors, the Committee of Unsecured Creditors, and Avnet entered into a stipulation on April 1, 2009 (the "PMSI Stipulation"), which provided that "[t]he Debtors agree that they will maintain any

2

and all funds they receive from accounts receivable that are
subject to the December PMSI in a segregated account." (Joint
Ex. 11.)

Notwithstanding the PMSI Stipulation, the Debtors did not
segregate the funds related to Avnet's collateral. On February
24, 2010, Avnet filed a Motion to Compel Laurus to turn over
$1,312,980.63 of PMSI funds that Laurus had received from the
Debtors. (D.I. 371.) After negotiations, Avnet filed the
Stipulation executed by the Debtors, Avnet, and Laurus on May 19,
2010, under certification of counsel, and the Court approved it.
(D.I. 399.) The Stipulation provided that Laurus would pay Avnet
$975,000 and that Laurus and the Debtors would release Avnet from
any and all claims in exchange for Avnet releasing the Debtors
and Laurus from any liability for claims relating to Avnet's PMSI
collateral, except Avnet's unsecured claim for $298,699.86.
(Id.)

On November 3, 2010, the Court converted the Debtors' cases
to chapter 7. The chapter 7 trustee (the "Trustee") subsequently
filed a complaint against Avnet seeking to avoid and recover
$5,444,541.11 as an alleged preference. The Court dismissed the
Trustee's complaint on November 26, 2012, finding that the
Trustee was bound by the Stipulation which had released that
claim. See In re Managed Storage Int'l, Inc., No. 09-10368 MFW,
2012 WL 5921723, at *1 (Bankr. D. Del. Nov. 26, 2012). The

3

Trustee appealed.  On January 16, 2015, the District Court reversed and remanded with instructions to review whether notice of the Stipulation was provided to creditors and to assess the Stipulation under the Third Circuit's <u>Martin</u> standard.  <u>Burtch v. Avnet, Inc.</u>, 527 B.R. 150, 157 (D. Del. 2015).

The Court held a hearing on March 18, 2015, and instructed Avnet's counsel to serve the 9019 settlement motion on all creditors in accordance with Local Rule 2002-1(b).  (Hr'g Tr. 34:22, D.I. 674.)  No objection was filed by any creditor as a result of that notice.  The Trustee did object and, after discovery was conducted, the Court held a hearing on July 31, 2018.  (D.I. 741.)  The parties presented argument on the <u>Martin</u> factors, including what the possible recovery would have been had the Debtor pursued an avoidance action as opposed to entering into the Stipulation.  The parties bolstered their arguments with deposition testimony, payment histories, and other exhibits to demonstrate that their positions had evidentiary support.  On August 14, 2018, the parties submitted Proposed Findings of Fact and Conclusions of Law.  (D.I. 743, 744-1.)  The matter is now ripe for decision.

II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this core proceeding.  28 U.S.C. §§ 1334 & 157(b)(2)(A), (F).  The Court

has jurisdiction to approve a settlement even in instances where it would not have jurisdiction over the underlying claim being settled. In re Washington Mut., Inc., 461 B.R. 200, 216 (Bankr. D. Del. 2011), vacated in part on other grounds, No. 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).

III. DISCUSSION

    A.   Standard for Approval of a Settlement

Federal Rule of Bankruptcy Procedure 9019(a) allows the Court to approve a compromise or settlement after notice and a hearing. The process of approval "requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." Martin, 91 F.3d at 393. Courts rely on four factors in making this determination: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation and the expense, inconvenience, and delay involved; (4) and the paramount interest of the creditors." Id. The Court is not called upon to decide the merits of the underlying litigation nor determine whether the settlement was the best possible compromise. In re Summit Metals, Inc., 477 F. App'x 18, 19 (3d Cir. 2012). The Court must "canvass the issues to see whether the settlement" could meet the lowest point of reasonableness. In re Nortel

5

Networks, Inc., 522 B.R. 491, 510 (Bankr. D. Del. 2014) (citing
In re W.R. Grace & Co., 475 B.R. 34, 77-78 (D. Del. 2012)). See
also In re Exide Tech., 303 B.R. 48, 68 (Bankr. D. Del. 2003)
(explaining that the Court is not tasked with deciding issues of
law or fact in evaluating a compromise under the first factor
enumerated in Martin).

      1.   Probability of Success

     The first factor to consider is the probability of success
in litigation.  Here, the litigation involves a possible
avoidance action under section 547(b) against Avnet which was
released in compromise of its motion to compel and possible suit
for contempt for violating the Order approving the PMSI
Stipulation.

     The Trustee asserts that the Debtors would have had a high
probability of success in an avoidance action against Avnet for
at least $1,853,641.77, whereas a contempt judgment against the
Debtors would not have exceeded $148,411.57.  The Trustee also
argues that the Stipulation itself was invalid because the
Debtors were not involved in negotiating the Stipulation and
Debtors' counsel did not have authority to agree to the
Stipulation.

     Avnet responds that it had an ordinary course of business
defense which would have lowered the possible recovery on an
avoidance action against Avnet to only $652,000, whereas a

6

contempt action against the Debtors could have resulted in the Debtors being liable for more than $1.25 million.  Finally, Avnet argues that the Debtors' counsel had authority to agree to the Stipulation.

a.   <u>Preference Action</u>

The Debtors made eight transfers to Avnet within the preference period totaling $5,110,049. (Joint Pretrial Mem. at ¶ 80.)  These payments were not subject to a PMSI but paid unsecured debts.  (<u>Id.</u>)  Initially, the Trustee asserted that the entire $5,110,049 was avoidable as a preference.  However, the Trustee concedes that Avnet had a new value defense for $1,169,307.04 of the transfers. 11 U.S.C. § 547(C)(1).  Avnet asserts an ordinary course of business defense for much of the remainder.  <u>Id.</u> at § 547(c)(2).

There are five factors which courts typically consider in determining whether payments made in the preference period are in the ordinary course of business.  Those factors are: (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the creditor or debtor to collect on or pay a debt; and (5) whether the creditor did anything to gain an advantage (such as gain

additional security) in light of the debtor's deteriorating financial condition.  In re Hechinger Inv. Co. of Delaware, Inc., 489 F.3d 568, 578 (3d Cir. 2007).

### i.   Ordinary Course Payments

The Trustee contends that payments on invoices that were later than fourteen days in arrears were not made in the ordinary course of business because 93.9% of Avnet invoices in the pre-preference period were paid by the fourteenth day in arrears. Therefore, he argues that payments in the preference period beyond fourteen days (totaling $1,853,641.77) were outside the ordinary course of business.  The Trustee also notes that the average payment more than doubled from 4.75 days in arrears pre-preference to thirteen days in arrears in the preference period, which also shows that the payments were outside the ordinary course.

Avnet compared the pre-preference period range of payments to the range in the preference period.  Avnet asserts that pre-preference period payments were made within a range of a few days before their due date to fifteen or sixteen days after their due date.  Avnet contends that preference period payments were largely within this range and that only those payments that were made twenty or more days in arrears might be considered outside of the ordinary course.  Thus, Avnet argues that transfers outside the ordinary course of business total no more than $652,000.

8

To determine what constitutes payment in the ordinary course of business, courts typically compare the number of days between the invoice dates and payment dates in the pre-preference period to those in the preference period. <u>In re FBI Wind Down, Inc.</u>, 581 B.R. 116, 138 (Bankr. D. Del. 2018); <u>In re Quebecor World (USA), Inc.</u>, 491 B.R. 379, 387 (Bankr. S.D.N.Y. 2013); <u>In re Am. Home Mortg. Holdings, Inc.</u>, 476 B.R. 124, 137 (Bankr. D. Del. 2012); <u>In re Archway Cookies</u>, 435 B.R. 234, 243 (Bankr. D. Del. 2010), <u>aff'd sub nom.</u> <u>In re Archway Cookies LLC</u>, 511 B.R. 726 (D. Del. 2013).

Courts have concluded that a comparison of the ranges (the method Avnet uses) is a useful measure of whether payments fall within the ordinary course. "[T]he standard set by the Third Circuit in <u>Molded Acoustical Products</u> requires evidence only of the range of terms that encompass practices similar in a general way to the defendant's." <u>Am. Home Mortg.</u>, 476 B.R. at 138. <u>See also</u> <u>FBI Wind Down</u>, 581 B.R. at 141 (explaining that "[p]ayments made in the Preference Period are deemed in the ordinary course of business when made within the range of the Historical Period.").

In comparison, courts have been skeptical of using an average of payment terms (the method the Trustee espouses). "The Trustee's reliance on the average payment time, as is often

the case with statistics, does not portray the complete picture of [the Debtors'] payment history." In re Glob. Tissue L.L.C., 106 F. App'x 99, 102 (3d Cir. 2004). However, courts will rely on a comparison of averages between the preference and pre-preference periods when the range is so broad that it would skew the analysis by impermissibly expanding the ordinary course of business. Quebecor, 491 B.R. at 386-87 (finding that the average time of payment can often be the starting point and ending point of an ordinary course analysis); In re Forklift LP Corp., No. 00-1730-LHK, 2006 WL 2042979, at *4 (D. Del. July 20, 2006) (relying on the weighted average in the historical period compared to the preference period).

Here, the range is not broad (0 to 55 days) and Avnet has a strong argument to support a range analysis. See Am. Home Mortg., 476 B.R. at 139 (relying on a range of 7 to 67 days); In re Elrod Holdings Corp., 426 B.R. 106, 109 (Bankr. D. Del. 2010) (finding a range of 35 to 73 to be in the ordinary course); In re Bros. Gourmet Coffees, Inc., 271 B.R. 456, 461 (Bankr. D. Del. 2002) (relying on an ordinary course range of 0 to 31 days).

Further, even using an average test as the Trustee does, the average within the preference period was only eight days longer than in the pre-preference period. Courts typically only find that payments are not ordinary when the average preference period payments differ from the historical period payments by far more

10

than eight days.  Compare Quebecor, 491 B.R. at 388 (finding that
a difference in average payments of 29.6 days demonstrated a
change in ordinary course), and Official Comm. of Unsecured
Creditors v. CRST, Inc. (In re CCG 1355, Inc.), 276 B.R. 377,
383-84 (Bankr. D.N.J. 2002) (a difference of 23 days was outside
the ordinary course), with In re Archway Cookies, 435 B.R. 234,
244 (Bankr. D. Del. 2010) (finding a difference of 4.9 days to be
immaterial), and Unsecured Creditors Comm. of Sparrer Sausage
Co., Inc. v. Jason's Foods, Inc., 826 F.3d 388, 396 (7th Cir.
2016) (finding that a difference in averages of 5 days is not
outside the ordinary course).

### ii.  Change in Business Terms

The Trustee argues that the Hechinger test supports a
determination that the payments were not made in the ordinary
course of business.  The Trustee points to the fact that Avnet
insisted on changing its course of dealing with the Debtors from
unsecured to secured, thereby negating Avnet's ordinary course
defense.

Avnet, however, presented evidence from which a court could
conclude that entering into the December PMSI was in the ordinary
course of business between Avnet and the Debtors.  Kathy Kagay,
Avnet's Senior Director of Credit and Collections, testified that
Avnet would enter into PMSIs routinely when a customer or client
was at or above their unsecured credit limit.  (Joint Ex. 125,

Kagay Dep. 11:1 - 12:25.)  The Debtors exceeded their credit
limit in October 2008 and in accordance with its practice, Avnet
required a PMSI.  (Id. at 17:9-22.)  Later in December, when the
Debtors were near their credit limit again, a PMSI was required.
(Id.)  Avnet asserts that this was done in the ordinary course of
business.

A creditor is not required to continue to do business with a
debtor on an unsecured basis in order to "avail itself of the
affirmative defense of section 547(c)(2)."  In re Big Wheel
Holding Co., Inc., 223 B.R. 669, 674 (Bankr. D. Del. 1998).
"[I]f the parties had the same relationship for a substantial
time frame prior to the debtor's insolvency, actions that appear
to take advantage of the debtor may still be in the ordinary
course of business."  In re AE Liquidation, Inc., No. 08-13031
(MFW), 2013 WL 5488476, at *7 (Bankr. D. Del. Oct. 2, 2013).

In this case, the only change in the relationship between
the parties was the institution of a PMSI when the Debtor was
close to or exceeded its credit limit.  This was consistent with
how Avnet treated the Debtors and its other customers.  (Joint
Ex. 125, Kagay Dep. 11:1-12:25.)  Furthermore, the other
Hechinger factors support Avnet's defense.  The Debtors and Avnet
had a lengthy relationship of more than three years.  (Joint Ex.
17, Kagay Decl. ¶ 3.)  The payments made by the Debtors in the
preference period were not in unusual amounts.  (Joint Ex. 121.)

12

The preference-period payments made to Avnet were not in a materially different manner from historical payments.  (Id.) Finally, none of the evidence provided shows that Avnet took any unusual action to collect on the Debtors' debt or coerce the Debtors to pay down their unsecured line of credit.

Based on the evidence provided, Avnet's argument that it had an ordinary course defense against the avoidance action is credible and sufficient to demonstrate that the Debtors had a low probability of success on a preference action for the amount the Trustee asserts.  It is more likely that the estate would have recovered no more than the $652,000 that Avnet asserts.

### b.   The Motion to Compel and the Contempt

The Court must also assess the likelihood that Avnet would have been able to recover on its claim that the Debtors were in contempt for violation of the PMSI Stipulation.  The Trustee concedes that the Debtors did not comply with the terms of the PMSI Stipulation which required the Debtors to segregate Avnet's collateral.  Instead, the Debtors transferred it, along with other sale assets, to Laurus.

The Trustee argues, however, that Avnet did not file a contempt motion against the Debtors.  Instead, Avnet filed a motion to compel against Laurus.  The Trustee contends that motion had little impact on the Debtors or the reasonableness of the release which the Debtors granted Avnet.  The Trustee asserts

13

that Laurus - not the Debtors - would have been compelled to pay Avnet if the latter were successful in its litigation.

The Trustee also argues that, even if Avnet had brought an action for contempt against the Debtors, the Debtors could have argued that the PMSI Stipulation did not require the segregation of funds already paid to Laurus.  Rather, the PMSI Stipulation simply required that the Debtors "maintain . . . funds they receive from accounts receivable" related to Avnet's PMSI collateral, not funds already received and transferred to Laurus. (Joint Ex. 12. ¶ 4.)  The Trustee asserts that the amount transferred after entry of the Order approving the PMSI Stipulation was only $148,411.57, which therefore is the maximum amount that could have been recovered by Avnet in an action for contempt.

Avnet argues that the Debtors agreed to the Stipulation because they were facing contempt and sanctions for violating the Court's Order.  Avnet notes that the Debtors admitted, and the Trustee does not dispute, that they did not comply with the PMSI Stipulation.  Debtors' counsel stated in an email to Laurus' counsel, at the time, that they cannot control what Avnet will do and that there could be "complications" with Avnet.  (Joint Ex. 77)  Therefore, Avnet asserts that the Debtors felt that Avnet's likelihood of succeeding on a motion for contempt and sanctions was high.

14

Avnet also disputes the Trustee's interpretation of the PMSI Stipulation itself. Avnet notes that the language of the Order specified that the Debtors were to "maintain any and all funds" related to the PMSI collateral for its benefit and not just those funds in the Debtors' possession after the Order was entered. (Joint Ex. 12 at ¶ 4.)

The Court concludes that Avnet has presented sufficient evidence to show it would have had a high probability of success on a contempt action against the Debtors. Contempt sanctions are appropriate where "(1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order." John T. ex rel. Paul T. v. Delaware Cty. Intermediate Unit, 318 F.3d 545, 552 (3d Cir. 2003).

In this case, there was a valid order that required the Debtors to segregate Avnet's collateral and proceeds. (Joint Ex. 12.) The Debtors had actual knowledge of that order as evidenced by the fact that the stipulation on which it was based was signed by Debtors' counsel. (Id.) Further, it is undisputed that the Debtors violated the PMSI Stipulation. The PMSI Stipulation required the Debtors to segregate not only funds transferred after entry of the Order, but "any and all funds" that were subject to Avnet's December security interest. (Joint Ex. 12 at ¶ 4.) Nonetheless, the Debtors transferred Avnet's money to Laurus and allowed Laurus to keep almost $1.25 million of Avnet's

15

collateral proceeds.  Therefore, there was a high probability of success on an action by Avnet for sanctions and contempt against the Debtors for at least $1.25 million.

### c.   Authority to Execute the Stipulation

The Trustee also asserts that at the time of the Stipulation, which was executed after the sale closed, there was no one with authority to approve it on the Debtors' behalf. (Joint Ex. 128, DiPaolo Dep. 62:9-20.)

However, as is usual in these cases, the sale agreement explicitly states that "[s]o long as the Chapter 11 Cases are pending" the Sellers shall have access to the books, records, and former employees of the Debtors "for the purposes of continuing administration of the Chapter 11 Cases." (D.I. 192-1 ¶ 8.10.) Anthony DiPaolo was the CFO of the Debtors and the Debtors' representative in this bankruptcy case.  The Sale Order did not end his authority, but extended it until completion of the administration of the chapter 11.

Avnet presented evidence that the Debtors' counsel and Mr. DiPaolo were involved in the bankruptcy administration after the sale closed.  For example, Mr. DiPaolo and Debtors' counsel communicated at length with Avnet after entry of the Sale Order regarding the reconciliation of Avnet's PMSI proceeds.  (Joint Ex. 68.)  Further, on May 11, 2010, just prior to the Court approving the Stipulation, Mr. DiPaolo emailed Debtors' counsel

16

stating that he did not wish to make any changes to the
Stipulation. (Joint Ex. 116, D.I. 724-13.) Therefore, Avnet has
presented credible evidence that Debtors' counsel at least had
implied authority to enter into the Stipulation on behalf of the
Debtors. See, e.g., Schwartz v. Chase, No. CIV.A. 4274-VCP, 2010
WL 2601608, at *5 (Del. Ch. June 29, 2010) (implied authority
"allows an agent to act based on the agent's reasonable
interpretation of the principal's manifestation in light of the
principal's objectives and other facts known to the agent.").

The Court concludes that the probability of success in
possible contempt litigation against the Debtors was high and
could have exceeded $1.25 million. In contrast, recovery on a
preference action against Avnet could have been much less than $1
million. Therefore, the Court finds that the first Martin factor
supports approval of the Stipulation.

### 2.   The Difficulties in Collection

The second Martin factor is the likely difficulties in
collection of any judgment. The Trustee asserts that collection
of the preferences against Avnet are a non-issue because Avnet
was a Fortune 100 company and has not claimed that the estate
would have faced any hardship in collecting any judgment against
it. The Trustee argues further that Avnet would have had no
difficulty in collecting its collateral from Laurus, as evidenced
by Laurus paying the settlement amount.

Avnet responds that collection of its PMSI collateral today
would be impossible because Laurus does not exist.  Therefore,
there is no way to put Avnet back in the position it was before
the Stipulation.  The Trustee responds that the difference
between the settlement amount and the actual amount of Avnet's
contempt claim could be asserted as an unsecured deficiency claim
to reduce any judgment on the avoidance action.

Both parties are mistaken on this point.  The Court does not
assess the difficulties in collection as they exist today, but
must assess the difficulties of collection at the time the
Stipulation was executed, in order to determine whether the
Debtors' decision at that time was at all reasonable.  See In re
Nortel, 522 B.R. at 510.

At the time the Debtors entered into the Stipulation they
had the option of pursuing a contentious preference action or
releasing that action to prevent a contempt proceeding.  Nothing
in the record suggests that the Debtors would have had difficulty
collecting from Avnet on an avoidance judgment.  However, if
Avnet prevailed on the contempt action, Avnet would have had an
administrative claim.  Therefore, any recovery by the Debtors on
the Avnet preference would have simply gone to pay Avnet's
contempt judgment.  Thus, the Court concludes that this factor
supports approval of the settlement.

3.   <u>Complexity, Expense, Inconvenience of Litigation</u>

Settling litigation will almost always result in a reduction of complexity, inconvenience, and expense for the parties involved.   <u>In re Nutraquest, Inc.</u>, 434 F.3d 639, 646 (3d Cir. 2006).   As such, "[t]he balancing of the complexity and delay of litigation with the benefits of settlement is related to the likelihood of success in that litigation."   <u>Id.</u>

Here, the difficulty faced by the Debtors in prosecuting an avoidance action against Avnet was significant, as evidenced by the number of exhibits and extensive briefing of that issue by the Trustee and Avnet now.   The Debtors would likely have needed to hire an expert on the ordinary course defense.   In contrast, Avnet would have had little difficulty in establishing that the Debtors were in contempt of the Court's Order approving the PMSI Stipulation.   Therefore, not entering into the Stipulation would have resulted in intense litigation, discovery, and cost on the preference action but a relatively easy action by Avnet on the contempt proceeding and sanctions.   The Court finds that this factor weighs in favor of approving the Stipulation.

4.   <u>Creditors' Interests</u>

The Trustee argues that the Stipulation was not in the best interest of creditors because it released preference claims with a value between $1,853,641.77 and $3,940,741.96 to avoid a contempt claim with little or no value.

19

Avnet responds that the Stipulation achieved finality and certainty on the Motion to Compel, potential contempt motion, and the preference action, which undoubtedly saved the estate money. Avnet argues further that even if the Debtors had been successful in the preference action, Avnet would have had an unsecured claim for any recovery under section 502(h), making the litigation expensive and futile. In addition, Avnet argues that the Debtors faced an administrative claim for $1,312,980.63 and additional sanctions for violation of the Court's Order.

The Court agrees with Avnet. The Debtors were faced with significant liability for violating the Court's Order. They had the choice of litigating a highly contentious avoidance action against Avnet or waiving the avoidance action to settle the motion to compel and possible contempt proceeding. Although success in a preference action would have resulted in an increase in assets of the estate, they would have been eclipsed by the administrative costs of the litigation and the contempt judgment. Further, any amount avoided as a preference would have been an unsecured claim itself, thereby diluting the benefit for other unsecured creditors of any preference recovery. In re BFW Liquidation, LLC, 899 F.3d 1178, 1188 (11th Cir. 2018). When comparing what the Debtors faced at the time of entering into the Stipulation with what the Debtors may have gained in protracted litigation, the Court finds that the Debtors' decision to enter

into the Stipulation fell far above the lowest point of reasonableness.  <u>Martin</u>, 91 F.3d at 393.

IV.   <u>CONCLUSION</u>

     For the reasons set forth above, the Court will approve the Stipulation.

     An appropriate order follows.

Dated: April 17, 2019          BY THE COURT:

                            Mary F. Walrath
                            United States Bankruptcy Judge